IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 420-081 |
| | ) | |
| EVANS CONCRETE, LLC | ) | |
| JAMES CLAYTON PEDRICK | ) | |
| GREGORY HALL MELTON | ) | |
| JOHN DAVID MELTON | ) | |
| TIMOTHY TOMMY STRICKLAND | ) | |

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

After careful consideration of the briefs and arguments made at the November 15, 2022 hearing, the Court **REPORTS** and **RECOMMENDS** the following motions seeking dismissal or suppression be **DENIED**, (doc. nos. 178, 185, 193, 197, 198, 206, 221). The Court issues a separate Report and Recommendation under seal for David Melton's Motion to Dismiss Indictment Due to Prosecutorial Misconduct, (doc. no. 223).

## I.     FACTUAL BACKGROUND

On September 2, 2020, a grand jury returned a four-count Indictment that alleges, in Count One, Defendants conspired with Companies 1, 2, and 3, Individual A, and others, from as early as 2010 until July 2016, to "suppress and eliminate competition by fixing prices, rigging bids, and allocating markets for sales of ready-mix concrete." (Doc. no. 1, Indictment ¶¶ 1-19.) The Indictment explains ready-mix concrete has residential and commercial applications, and the market is localized because concrete must be poured quickly, typically within an hour, after being mixed and loaded onto a truck. (Id. ¶ 4.)

Count One describes and charges the alleged co-conspirators. Headquartered in Claxton, Georgia, Defendant Evans Concrete, LLC, manufactured and sold ready-mix concrete in the Southern District of Georgia. Defendant Timothy "Bo" Strickland served in various roles at Evans Concrete including owner, president, area manager, plant manager, and salesperson. Companies 1, 2, and 3 manufactured and sold ready-mix concrete in the Southern District of Georgia. Defendant Greg Melton was a division manager for Company 1 in its Pooler, Georgia office, and Defendant James Pedrick was a salesman for Company 1. Defendant David Melton was the general manager of Company 2, and Individual A was the owner of Company 2.

The Indictment alleges the following overt acts by Defendants and co-conspirators:

A. Used Defendant PEDRICK as a conduit to exchange price-increase letters and other pricing and job-related information among the defendants and other co-conspirators for the purpose of coordinating price increases, rigging bids, and allocating jobs;

B. Issued price-increase letters to ready-mix concrete customers, which letters reflected the price increases agreed-upon by the defendants and other co-conspirators;

C. Allocated specific ready-mix concrete jobs, including but not limited to allocation between Company-1 and Defendant EVANS of jobs in the Statesboro, Georgia, area;

D. Allocated specific ready-mix concrete jobs, including but not limited to allocation between Defendant GREG MELTON of Company-1 and Defendant DAVID MELTON of Company-2 of residential jobs;

E. Agreed to charge ready-mix concrete customers fuel surcharges and environmental fees;

F. Submitted quotes and bids to ready-mix concrete customers at collusive and noncompetitive prices;

G. Obtained the economic benefits of the charged conspiracy by receiving and accepting payments for ready-mix concrete sold through contracts

and on projects that were affected by the conspiracy alleged in this Count;

H.    Pressured other concrete suppliers to participate in the conspiracy alleged in [Count One] and threatened companies that refused to join; and

I.    Concealed the conspiracy and conspiratorial contacts through various means, including by using Defendant PEDRICK as a conduit to exchange price-increase letters and information among the defendants and other co-conspirators.

(Id. ¶ 14.)

Count Two charges Pedrick with making false statements to federal agents on February 5, 2018, by claiming he (1) never heard of collusion or price fixing in the Savannah market; and (2) never personally discussed concrete price increases with David Melton.  (Id. ¶¶ 20-22.)   Counts Three and Four similarly charge Strickland with perjury and making false statements when he allegedly told federal agents on October 8, 2015, that (1) neither he nor anyone else communicated with Company 1 concerning a concrete job at the Georgia Southern University ("GSU") biology building; (2) he never discussed with Greg Melton either prices of concrete or specific concrete jobs in Statesboro or at GSU; (3) he never discussed with Greg Melton or Pedrick, or anyone else at Company 1, specific concrete projects at The Islands, a GSU dining facility, Briggs and Stratton, a GSU recreational facility, Aspen Heights, and McDonald's; and (4) he never received from Pedrick any price increase letters before those letters were sent to customers.  (Id. ¶¶ 23-28.)

The Indictment marked the third rather than first chapter in the federal government's investigation of price-fixing in the ready-mix concrete market.  The Department of Justice ("DOJ") Antitrust Division opened the first investigation in February 2012 and closed it in January 2013 without filing charges.  Also in January 2013, the DOJ closed its Antitrust

Division's Atlanta office due to restructuring.  On April 17, 2013, Chris Young, a sales manager for the concrete company Argos, filed a *qui tam* action alleging False Claims Act violations against a bevy of concrete companies and individuals including Evans Concrete, Strickland, Pedrick, Greg Melton.  United States *ex rel.* Young v. LaFarge, S.A., Case No. CV 413-095, doc. no. 1 (S.D. Ga. Apr. 17, 2013).  The *qui tam* action prompted a second federal investigation by the U.S. Attorney for the Southern District of Georgia.  Three years later in July 2016 the government declined to intervene, and the *qui tam* action was dismissed.  Id., doc. nos. 32, 36.  In 2017, the FBI, Postal Service, and DOJ Antitrust Division initiated a third investigation that culminated in the September 2020 grand jury session and current Indictment.

## II.    DISCUSSION

### A.    Motions to Dismiss for Covid-19 Grand Jury Protocols

Defendants move to dismiss the Indictment, arguing procedures enacted to protect the health and safety of grand jurors violated Fed. R. Crim. P. 6 and the CARES Act, and thus Defendants' Fifth Amendment right to a valid grand jury indictment.  (Doc. nos. 178, 206; see also doc. nos. 320, 336); see Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 15002(b), 134 Stat. 281 (Mar. 27, 2020).  In response to the pandemic, Chief United States District Judge J. Randal Hall issued a Standing Order authorizing grand jurors to convene in the Augusta, Brunswick, and Savannah federal courthouses, depending on each grand juror's county of residence, rather than everyone meeting together in a Savannah courtroom as is customary.  In Re: Coronavirus/COVID-19 Pandemic and the Use of Grand Jury Telecomm. Facilities, MC 120-011, (S.D. Ga. May 13, 2020) (hereinafter "Standing Order").

Grand jurors in the Augusta and Brunswick courthouses participated by video

teleconference in grand jury proceedings occurring at the Savannah courthouse, where the government and its witnesses were physically present.  Id.  The Court permitted no more than ten grand jurors to convene at any one courthouse and tasked Court Security Officers with safeguarding the grand jury from intrusions.  Id.  The parties stipulated the grand jury that issued the Indictment met in this manner September 2, 2020 in accordance with the Standing Order procedures.  (Doc. no. 290.)

Whether the Standing Order violates Rule 6 and the CARES Act has already been addressed by United States District Judge Lisa Godbey Wood and Magistrate Judge Benjamin W. Cheesbro in United States v. Graham, No. 2:20-CR-47, 2021 WL 2593630, at *5-9 (S.D. Ga. June 24, 2021), adopted by 2021 WL 4352320 (S.D. Ga. Sept. 24, 2021).  Their excellent analyses apply fully here and need not be repeated.  For the reasons stated by Judges Wood and Cheesbro, the Standing Order does not violate the CARES Act, Rule 6, or the Fifth Amendment.  The procedures sufficiently preserved grand jury secrecy and fell well within the Court's grand jury regulatory powers.  Even if there were any procedural infirmities, the harmless error doctrine precludes dismissal.  Accordingly, the motions to dismiss challenging the Standing Order should be **DENIED**.  (Doc. nos. 178, 206.)

**B.      Motions to Dismiss Counts One and Two for Deficiencies in the Indictment**

**1.      The Indictment Is Not Duplicitous**

Defendants move to dismiss Counts One and Two for duplicity.  (Doc. nos. 185, 197, 221.)  For the reasons explained below, these motions should be **DENIED**.

### i.      Analytical Framework

"A count in an indictment is duplicitous if it charges two or more 'separate and distinct' offenses." United States v. Schlei, 122 F.3d 944, 977 (11th Cir. 1997) (citation omitted). Duplicitous counts are problematic because a jury may convict a defendant without unanimous agreement on the same offense, a defendant may suffer prejudice in a subsequent double jeopardy defense, and a court may find it difficult to rule on the admissibility of evidence. Id. However, "[w]here the language of a statute proscribes several means by which the defendant might have committed a violation, the government may plead the offense conjunctively and satisfy its burden of proof by any one of the means." United States v. Cornillie, 92 F.3d 1108, 1110 (11th Cir. 1996) (per curiam). "An indictment is not duplicitous if, in one count, it charges a defendant with violating [a] statute in [multiple] ways." United States v. Burton, 871 F.2d 1566, 1574 (11th Cir. 1989) (per curiam); see United States v. Thomas, No. 1:12:CR-188-TWT/AJB, 2012 WL 6963671, at *3 (N.D. Ga. Dec. 31, 2012) ("Where one broad conspiracy exists, charging multiple purposes is not improper" (citing United States v. Lyons, 703 F.2d 815 (5th Cir. 1983))), adopted by 2013 WL 362860 (N.D. Ga. Jan. 30, 2013).

"The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects." United States v. Ramos, 666 F.2d 469, 473 (11th Cir. 1982) (quoting Braverman v. United States, 317 U.S. 49, 54 (1942)) (internal quotations omitted). In determining whether a single conspiracy is pled, courts consider: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir. 1997). A single conspiracy is often described as a "hub-and-spoke"

conspiracy, "in which a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise." United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004). However, "where the spokes of a conspiracy have no knowledge of or connection with the other spokes and deal independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." United States v. Seher, 562 F.3d 1344, 1367 (11th Cir. 2009) (quoting Chandler, 388 F.3d at 807) (internal quotations omitted).

The jury determines whether evidence supports a single conspiracy or multiple conspiracies, and, on a motion to dismiss for duplicity, the Court is limited "to consideration of the face of the indictment and inferences reasonably drawn from those facts in support of the charges as pled." United States v. Slawson, No. 1:14-CR-00186-RWS, 2014 WL 5804191, at *8 (N.D. Ga. Nov. 7, 2014), adopted by 2014 WL 6990307 (N.D. Ga. Dec. 10, 2014); see Calderon, 127 F.3d at 1327. Even when a court finds duplicity, dismissal is not the sole remedy. Generally, "ambiguity [can] be cured through jury instructions and/or special interrogatories." United States v. Campbell, No. 1:04-CR-0424-RWS, 2005 WL 6436621, at *7 (N.D. Ga. Oct. 24, 2005). For example, "any concern regarding jury unanimity may be addressed by curative instructions to the jury that its verdict must be unanimous on whatever specification the jurors find to be the predicate of a guilty verdict." United States v. Carter, No. CR 106-122, 2007 WL 230451, at *4 (S.D. Ga. Jan. 24, 2007) (citing United States v. Natelli, 527 F.2d 311, 325 (2d Cir. 1975) and Schlei, 122 F.3d at 980); see United States v. Rives, No. 114CR00130TWTJFK4, 2015 WL 7574759, at *18 (N.D. Ga. Sept. 15, 2015) (explaining jury instructions on unanimity may cure duplicity concerns in conspiracy indictment), adopted by 2015 WL 7575933 (N.D. Ga. Nov. 25, 2015).

ii.      **Count One Is Not Duplicitous**

Citing facts outside the four corners of the Indictment, Defendants contend the conspiracy charge in Count One is duplicitous because Evans Concrete competed only in the Statesboro market, and Company 2 (David Melton's employer) competed only in the Savannah market. (Doc. no. 221, pp. 3-4.) While Company 1 (Greg Melton's employer) competed in both markets, Defendants argue any conspiracy between Companies 1 and 2 in Savannah must have been separate and independent from any conspiracy involving Evans Concrete and Company 2 in Statesboro. Furthermore, Defendants argue, the Savannah and Statesboro markets can be further divided into residential and commercial markets.

Because of these geographical and market divisions, Pedrick argues "there was no overall agreement which affected these diverse markets, [and] it is duplicitous to charge all defendants in one broad conspiracy count, as alleged in Count One." (Doc. no. 197, p. 4.) Greg Melton argues Count One is duplicitous because "[i]t is possible that one juror may vote to convict [defendant] under one alleged agreement, such as in the Statesboro area, or in allocating residential ready-mix concrete jobs in Savannah." (Doc. no. 185, p. 6.) There can be no hub-and-spoke conspiracy, according to Defendants, because the existence of multiple markets means there is no common goal.

The Indictment alleges a single conspiracy with a common purpose to "fix prices, rig bids, and allocate markets for sales of ready-mix concrete in the Southern District of Georgia and elsewhere." (Indictment ¶ 3.) The Indictment does discuss the localized nature of the ready-mix concrete industry caused by the necessity of pouring concrete within one hour of preparation, but it does not describe how this limitation impacts the market or scope of each Defendant's area of service. The Indictment also lists the allocation of jobs by Evans Concrete

in Statesboro and the allocation of residential jobs by Companies 1 and 2 generally as examples of the manner and means of a single conspiracy. (Id. ⁋ 14.)  However, these are non-exhaustive examples of acts to further the conspiracy; indeed, the Indictment alleges these acts were in furtherance of the *overall* goal to "fix prices, rig bids, and allocate markets for sales of ready-mix concrete in the Southern District of Georgia and elsewhere." (Id. ⁋ 3.)

These allegations are sufficient to pass muster at the motion to dismiss stage. See United States v. Northcutt, No. 07-60220-CR, 2008 WL 162753, at *6 (S.D. Fla. Jan. 16, 2008) (finding plain reading of indictment alleging a single conspiracy "in the United States and elsewhere" sufficient despite defendants' arguments multiple markets—and thus conspiracies—existed); see also United States v. Maliszewski, 161 F.3d 992, 1015 (6th Cir. 1998) ("[E]vidence of multiple players and multiple locales does not equate with evidence of multiple conspiracies."); United States v. Heinemann, 801 F.2d 86, 92 (2d Cir. 1986)  ("[A] single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations.").

That David Melton in Savannah did not have a relationship with Strickland and Evans Concrete in Statesboro does not destroy the potential of a single Sherman Act conspiracy.  A Sherman Act conspiracy can exist between non-competitors and subgroups, provided conspirators are acting toward "one overarching plan." United States v. Chastain, 198 F.3d 1338, 1350 (11th Cir. 1999); see Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc., 242 F. Supp. 2d 1350, 1361 (S.D. Fla. 2003) (explaining conditions where non-competitor may participate in Sherman Act conspiracy).  As the Eleventh Circuit has explained, "It is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy; all that the government must prove to establish conspiracy

liability is an agreement or common purpose to violate the law and intentional joining in this goal by the coconspirators." United States v. Alred, 144 F.3d 1405, 1415 (11th Cir. 1998) (citing United States v. Cole, 755 F.2d 748, 764 (11th Cir. 1985)).

At trial the government must prove this common goal, and "[i]f the Government cannot meet its burden, such as if it only proves the existence of multiple, distinct conspiracies instead of the single conspiracy charged in the Indictment, the Court can revisit Defendants' arguments after the close of the Government's case." United States v. Balotin, No. 3:19-CR-191-MMH-JBT, 2021 WL 2351738, at *3 (M.D. Fla. June 9, 2021); see Northcutt, 2008 WL 162753, at *6 (explaining *jury* must decide whether there is one or multiple markets and conspiracies). For these reasons, the motion to dismiss Count One for duplicity should be **DENIED**.  (Doc. no. 221.)

### iii.        Count Two Is Not Duplicitous

Pedrick argues Count Two is also duplicitous because it accuses him of making two false statements during the same interview.  (Doc. no. 197.)  However, multiple false statements in one interview can properly be charged in a single count because an indictment is not duplicitous for charging multiple ways of violating a statute in one count.  See Burton, 871 F.2d at 1574; see also United States v. Edmondson, 410 F.2d 670, 673, n.6 (5th Cir. 1969)[1] ("All of the several particulars in which the defendant swore falsely may be embraced in one count, and proof of the falsity of any one will sustain the count."); United States v. Watson, No. CRIM A 508-CR-32-HL, 2008 WL 3256662, at *2 (M.D. Ga. Aug. 5, 2008) ("In perjury

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

cases, a count is not rendered duplicitous by the mere fact that it contains several alleged false statements." (citing United States v. Wood, 780 F.2d 955, 962-63 (11th Cir. 1986))); United States v. Herman, No. 18-CR-10032-JES-JEH, 2018 WL 4901168, at *2 (C.D. Ill. Oct. 9, 2018) (holding false statement indictment alleging multiple false statements on same day was not duplicitous); United States v. McCafferty, No. 1:10CR387, 2011 WL 933771, at *9 (N.D. Ohio Mar. 16, 2011) ("Other courts have found it appropriate to charge multiple false statements in a single count where the statements were all made in the same event or on the same document.").

Even if there was duplicity, which there is not, Pedrick concedes in briefing "unanimity instructions or other relief could cure the duplicity issue." (Doc. no. 254, p. 1; see also doc. no. 197, p. 8.) Pedrick's motion to dismiss should be **DENIED** to the extent it argues Count Two is duplicitous. (Doc. no. 197.)

### 2. Count One of the Indictment Is Sufficiently Specific and Properly Pleads a Jurisdictional Basis

Greg Melton argues Count One should be dismissed because it fails to (1) specify his alleged unlawful activities and distinguish them from valid and legal business activities, jobs, and contracts for ready-mix concrete during the six-year period; and (2) plead a proper jurisdictional basis for Sherman Act conspiracy under 15 U.S.C. § 1. (See doc. no. 185.)

An indictment is sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges, and (3) enables the accused to rely upon a judgment as a bar against double jeopardy. United States v. Walker, 490 F.3d 1282, 1296 (11th Cir. 2007); United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985). The sufficiency of a criminal indictment is determined from its face. United States v. Sharpe, 438 F.3d 1257,

1263 (11th Cir. 2006).  "'Facial sufficiency is not a high hurdle.'"  United States v. Woods,

730 F. Supp. 2d 1354, 1372 (S.D. Ga. 2010) (quoting United States v. Bates, 96 F.3d 964, 970

(7th Cir. 1996)).  "An indictment that tracks the language of the relevant statute is sufficient,

as long as it also provides a statement of facts and circumstances that give notice of the offense

to the accused."  Walker, 490 F.3d at 1296 (citation omitted); United States v. Silverman, 745

F.2d 1386, 1392 (11th Cir. 1984).  Factual allegations must be viewed in the light most

favorable to the government, and an indictment need not allege in detail the factual proof that

will be relied upon to support the charges.  United States v. Belcher, 927 F.2d 1182, 1185 (11th

Cir. 1991); United States v. Crippen, 579 F.2d 340, 342 (5th Cir. 1978).

To hold a defendant criminally liable in a Section One Sherman Act conspiracy

involving allegations of *per se* unreasonable restraints, such as bid rigging and job allocation,

the government must prove the following elements:

1.  The conspiracy described in the indictment existed at or about the time alleged;
2.  The defendant knowingly became a member of the conspiracy; and
3.  The conspiracy described in the indictment either affected interstate commerce in goods or services or occurred within the flow of interstate commerce in goods and services.

See ABA-JI-CRIMANTI 3.C (2009) (citing United States v. Alston, 974 F.2d 1206, 1210 (9th

Cir. 1992)); United States v. All Star Indus., 962 F.2d 465, 474-75 (5th Cir. 1992), *rev'd on*

*other grounds*, United States v. Calverley, 37 F.3d 160 (5th Cir. 1994) (*en banc*); see also 15

U.S.C. § 1; Appleton v. Intergraph Corp., 627 F. Supp. 2d 1342, 1352 (M.D. Ga. 2008)

(explaining defendant violates Section One by creating or joining agreement between multiple

parties that unreasonably restrains trade); In re Terazosin Hydrochloride Antitrust Litig., 352

F. Supp. 2d 1279, 1311 (S.D. Fla. 2005) (listing price fixing and market allocation as *per se*

unreasonable restraints on trade); Levine v. Central Fla. Med. Affiliates, Inc., 72 F.3d 1538,

1545 (11th Cir. 1996) ("The only inquiry in such [*per se* unreasonable restraints on trade] cases is whether there was an agreement to do so . . . .").

The Indictment sufficiently alleges the essential elements of a Sherman Act conspiracy, and it does not fail for lack of specificity.  Greg Melton argues the Indictment should specify the projects and activities that constitute Sherman Act violations, and he seeks clarity concerning which projects the government intends to use as proof of the conspiracy at trial. This is a common theme across many of Defendants' pretrial motions.   However, the Indictment contains enough detail to be legally sufficient.   Furthermore, the government sufficiently addressed all of defense counsel's concerns with unfair surprise at trial by agreeing to provide its preliminary exhibit list, preliminary witness list, and list of alleged co-conspirators far in advance of trial.  (See doc. no. 296.)

The Indictment also sufficiently alleges jurisdiction.  The jurisdictional element may be pled and proved "under either of the following two theories:  (1) the offending activities took place in the flow of interstate commerce (flow theory); or (2) the defendants' general business activities had or were likely to have a substantial effect on interstate commerce (effects theory)."  United States v. Giordano, 261 F.3d 1134, 1138 (11th Cir. 2001).  "There is no trick to pleading jurisdiction under the Sherman Act in a criminal case.  The indictment, viewed as a whole and in a practical sense, must simply set forth the elements of the offense charged . . . ."  United States v. Fitapelli, 786 F.2d 1461, 1463 (11th Cir. 1986).

The Indictment properly pleads a jurisdictional basis under both the flow and effects theories in paragraph nineteen, which provides as follows:

> During the time period covered by Count One, the business activities of the defendants and other co-conspirators in connection with ready-mix concrete that

is the subject of Count One, were within the flow of, and substantially affected, interstate and foreign trade and commerce.

(Indictment ¶ 19.)  This paragraph is similar to the challenged indictment in <u>Giordano</u>, which the Eleventh Circuit found sufficiently alleged jurisdiction under both theories.  <u>See</u> 261 F.3d at 1139; <u>Northcutt</u>, 2008 WL 162753, at *4 (finding Sherman Act indictment pled jurisdiction basis because "In <u>Giordano</u>, the Eleventh Circuit examined the nearly identical indictment language and determined that both the flow theory and the effects theory were properly pled.").  Because the Indictment is sufficiently specific and properly pleads a jurisdictional basis under both the flow and effects theories, the motion to dismiss Count One on those grounds should be **DENIED**.  (Doc. no. 185.)

### 3.    Count Two of the Indictment Is Not Fundamentally Ambiguous

Pederick argues there is fatal ambiguity in Count Two, which alleges that, during an interview with federal agents on February 5, 2018, Pedrick violated 18 U.S.C. § 1001 by falsely stating he never (A) "heard of collusion or price-fixing in the Savannah market"; and (B) "personally discussed concrete price increases with DAVID MELTON."  (Indictment ¶ 21.)  The Indictment alleges these statements were false because, at that time, Pedrick (A) "had heard of and knew of collusion and price fixing in the Savannah market"; and (B) "had personally discussed price increases with DAVID MELTON."  (<u>Id.</u> ¶  22; doc. no. 198.)

The elements of a false statement charge under 18 U.S.C. § 1001 are:  (1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction.  <u>United States v. Godinez</u>, 922 F.2d 752, 755 (11th Cir. 1991).  The Indictment satisfies each of these elements by alleging Pedrick "knowingly and willfully made false statements to federal law enforcement agents which were material to a matter within" their jurisdiction.  (Indictment ¶ 21.)  The

Indictment further provides the date, location, and content of the allegedly false statements, and explains why the statements are allegedly false.  The Indictment is thus facially sufficient, and none of Pedrick's arguments convinces the Court there is a flaw that merits dismissal.

Dismissal of a false statement count may be warranted if the question eliciting the statement "is deemed fundamentally ambiguous as a matter of law," because it "'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time . . . .'"  United States v. Hassoun, 477 F. Supp. 2d 1210, 1218 (S.D. Fla. 2007) (quoting United States v. Manapat, 928 F.2d 1097, 1100 (11th Cir. 1991)).  When a question is merely susceptible to multiple interpretations, it is arguably ambiguous rather than fundamentally ambiguous, and "'the defendant's understanding of the question is a matter for the jury to decide.'"  Manapat, 928 F.2d at 1099 (quoting United States v. Bell, 623 F.2d 1132, 1136 (5th Cir. 1980)).  Fundamental ambiguity is the exception and not the rule.  United States v. Farmer, 137 F.3d 1265, 1269 (10th Cir. 1998) (citing Manapat, 928 F.2d at 1099).

The most obvious problem with Pedrick's ambiguity argument is the impossibility of determining whether the questions asked are fundamentally ambiguous when those questions cannot be found anywhere in the Indictment or the evidentiary record.  Courts recognize it is "nearly impossible" to determine fundamental ambiguity without a verbatim transcript of the interview.  United States v. Ricard, 922 F.3d 639, 651 (5th Cir. 2019).  In stark contrast to the present predicament, for example, the Eleventh Circuit in Manapat declared questions on a Federal Aviation Administration form were fundamentally ambiguous, as the court could readily determine the exact questions, answers, and context from the plain language of the

form itself.  Manapat, 928 F.2d at 1097.  Without any indication of what Pedrick was asked here, the Court cannot find ambiguity.

The remainder of Pedrick's arguments convince the Court, from what is presently alleged in the Indictment, this is a classic case of arguable ambiguity best left for determination by the jury.  For example, Pedrick argues his compound statement "he had never heard of collusion or price-fixing in the Savannah market" is just as ambiguous as a compound question.  Courts have found a simple answer of yes or no to a compound question is ambiguous because it is unclear whether the answer concerns one or both parts of the question.  See United States v. Rendon-Marquez, 79 F. Supp. 2d 1361, 1363 (N.D. Ga. 1999) (finding answering "no" to compound question did not constitute false statement), aff'd, 228 F.3d 416 (11th Cir. 2000).  However, a compound answer does not pose the same problem.  If Pedrick stated he never heard of collusion or price-fixing, his answer is still false if he had heard of either or both.  A jury should determine whether the statement is false.

Pedrick also argues "collusion," "price fixing," and "discussed" do not have precise definitions and can mean different things to different people, relying in part on United States v. Stacks, 821 F.3d 1038, 1044 (8th Cir. 2016).  In Stacks, the Eighth Circuit held the terms "current" and "delinquent"  with respect to loan payments were fundamentally ambiguous due to the absence of a consistent meaning within the banking industry.  The Eighth Circuit did not decide this issue in the context of a pretrial motion, based on the indictment allegations only, but instead had the advantage of considering the entire trial transcript post-conviction.  Pedrick's arguments are better made in that post-trial context as well, where the Court can weigh the testimony of the interviewing agents and defense witnesses, as well as competing definitions of the operative words and phrases.

16

Pedrick further notes "price increases" is plural in Count Two and explains there is only evidence of *one* price increase with which he was familiar. This semantic, evidence-dependent reasoning is inappropriate in a motion to dismiss. Likewise, Pedrick last argues "heard of collusion" is different than knowing of collusion, meaning he could have hypothetically known without hearing. The distinction is meaningless here, as the Indictment claims Pedrick "heard of *and* knew of collusion and price fixing in the Savannah market." (Indictment ¶ 22 (emphasis added).)

Pedrick closes his briefing by explaining how difficult the government's burden at trial will be since it has not produced the questions which solicited the statements the government alleges are false. The government has sufficiently pled the elements of a false statement charge, and there are no fundamental, facial ambiguities that might subject the Indictment to dismissal. The motion to dismiss Count Two on these grounds should be **DENIED**. (Doc. no. 198.)

### C.      Motion to Dismiss Count Two for Misconduct, or Suppress Statements

Pedrick moves to dismiss Count Two or to suppress the statements forming the basis of Count Two, contending a federal prosecutor allowed agents to interview him on February 5, 2018, despite knowing Pedrick was represented in the matter by an attorney, in violation of Georgia Rule of Professional Conduct 4.2. (Doc. nos. 193, 251.) The Court need not determine whether government attorneys committed misconduct because the Court cannot provide Pedrick's requested relief regardless.

Pursuant to the Citizens Protection Act, 28 U.S.C. § 530B, federal prosecutors are subject to the Georgia Rules of Professional Conduct and Local Rules of this Court. The

Georgia no-contact rule, set forth in Georgia Rule of Professional Conduct 4.2, provides as follows:

> RULE 4.2 COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL
>
> > (a)    A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or court order.
> >
> > (b)    Attorneys for the State and Federal Government shall be subject to this Rule in the same manner as other attorneys in this State.

The maximum penalty for a violation of this Rule is disbarment.

Suppression is not an available remedy for a violation of the no-contact rule even assuming the federal prosecutor knowingly violated Rule 4.2 because, as the Eleventh Circuit held in United States v. Lowery, 166 F.3d 1119, 1124 (111th Cir. 1999), "a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible." The Lowery court explained its reasoning as follows:

> Federal law, not state law, determines the admissibility of evidence in federal court.  "Although there is an important state interest in the regulation of attorneys practicing within its borders, there is a competing federal interest in the enforcement of federal criminal law." United States v. Cantor, 897 F. Supp. 110, 115 (S.D.N.Y. 1995).  The same principle applies to civil law as well.
>
> When it comes to the admissibility of evidence in federal court, the federal interest in enforcement of federal law, including federal evidentiary rules, is paramount.  State rules of professional conduct, or state rules on any subject, cannot trump the Federal Rules of Evidence.  Cf. Baylson v. Disciplinary Bd. Of Supreme Court of Pa., 975 F.2d 102, 111-12 (3d Cir. 1992) (refusing to apply in federal court a state ethics rule that was inconsistent with the Federal Rules of Criminal Procedure and interfered with federal grand jury practice).  Federal Rule of Evidence 402 provides:
>
> > All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by

>>these rules, or by other rules prescribed by the Supreme Court
>>pursuant to statutory authority.
>>
>>That is an exclusive list of the sources of authority for exclusion of evidence in
>>federal court.  State rules of professional conduct are not included in the list.
>>Local rules of federal courts are not listed in Rule 402, either.  As a result,
>>otherwise admissible evidence cannot be excluded based upon local rules.  For
>>that reason, the Southern District of Florida's adoption of the State of Florida's
>>professional conduct rules does not affect our analysis or the result.

Lowery, 166 F.3d at 1124-25.  For these reasons, the Lowery court did not determine whether a federal prosecutor violated the Florida Bar Rules of Professional Conduct by offering an inducement to a witness, but instead held that suppression of evidence would be inappropriate even if the violation had occurred.

Citing Lowery, this Court denied a motion to suppress statements obtained in violation of the Georgia no-contact rule in United States v. Tapp, No. CR 107-108, 2008 WL 2371422, at *20 (S.D. Ga. June 4, 2008).  The Court concluded the no-contact rule "should be interpreted by courts as a guide for professionalism among attorneys, not as a vehicle for conferring substantive criminal rights not provided by the Constitution."  Id. at *17.  The Court held suppression would only be appropriate if violation of the no-contact rule rose to the level of violating a constitutional right such as the Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel.  See id. at *18; see also United States v. Parrish, No. CR420-124-17, 2022 WL 662306, at *4 (S.D. Ga. Mar. 4, 2022) ("[T]his Court . . . has rejected the argument that professional conduct rules confer substantive rights on criminal defendants.), adopted by 2022 WL 987994 (S.D. Ga. Mar. 31, 2022); United States v. Scrushy, 366 F. Supp. 2d 1134, 1141 (N.D. Ala. 2005) ("Even if the contacts did constitute an ethical breach, the Eleventh Circuit law is clear that an ethical breach cannot be the basis for exclusion of evidence.").

If Pedrick believes a substantive right was violated here, he fails to articulate how.  His discussion of the Sixth Amendment right to counsel implicitly recognizes that right does not attach until after formal charges and certainly not during a pre-indictment interview.  See Moran v. Burbine, 475 U.S. 412, 428-32 (1986) (holding Sixth Amendment right to counsel does not attach to pre-indictment interrogations).  Without a violation of substantive rights, suppression and dismissal are inappropriate.  Instead, the most the Court may do is sanction the attorney who violated the no-contact rule.  Tapp, 2008 WL 2371422, at *18; Bane v. Se. Corr. Med. Grp., No. 1:19-CV-179 (LAG), 2022 WL 993017, at *4 (M.D. Ga. Mar. 31, 2022) (explaining remedy for violation of ethical rules is sanctions, not suppression).

Pedrick points to cases from other circuits that suppress statements made in violation of the no-contact rule.  See, e.g., United States v. Hammad, 858 F.2d 834, 840-41 (2d Cir. 1988); United States v. Killian, 639 F.2d 206, 210 (5th Cir. 1981); United States v. Koerber, 966 F. Supp. 2d 1207, 1214-46 (D. Utah 2013).  These cases, however, cannot be reconciled with Lowery and Tapp.  See Scrushy, 366 F. Supp. 2d 1134, 1141 (declining to follow Killian and Hammad); United States v. Sabean, No. 2:15-CR-175-GZS, 2016 WL 5721135, at *6 (D. Me. Oct. 3, 2016) ("In the Court's assessment, Koerber is an isolated, unusual case . . . ."); United States v. Joel, No. 15-CR-0430-GPC, 2015 WL 5704297, at *6 n.2 (S.D. Cal. Sept. 29, 2015) (declining to follow Koerber as it was decided outside the circuit and is not binding).

For these reasons, the motion to dismiss or suppress should be **DENIED**.  (Doc. no. 193.)

### III.   CONCLUSION

For the reasons state above, the Court **REPORTS** and **RECOMMENDS** the following motions seeking dismissal or suppression be **DENIED**, (doc. nos. 178, 185, 193, 197, 198, 206, 221).

SO REPORTED AND RECOMMENDED this 20th day of April, 2023, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA